J. A33004/15 & J. A33005/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| SIKWA STEEL, | : | No. 3273 EDA 2014 |
| | : | |
| Appellant | : | |

Appeal from the Judgment Entered October 17, 2014,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0012442-2012

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| MICHAEL RUDD, | : | No. 1812 EDA 2014 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, March 27, 2014,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0012443-2012

BEFORE:  FORD ELLIOTT, P.J.E., STABILE AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED FEBRUARY 23, 2016**

Michael Rudd and Sikwa Steel appeal from the March 27, 2014

judgments of sentence following their convictions of third-degree murder,

---

* Retired Senior Judge assigned to the Superior Court.

conspiracy to commit third-degree murder, various violations of the Uniform

Firearms Act, and possession of an instrument of crime.[1]  We affirm.[2]

The trial court provided the following facts:

> In the early morning hours of July 22, 2007, Charles Tunstall (hereafter referred to as the "decedent"), suffered a fatal gunshot wound to the head on 54th and Arlington Street in Philadelphia. Upon investigation of the crime scene, five fired cartridge cases from a caliber .380 semi-automatic pistol were recovered.
>
> Dr. Marlon Osbourne, assistant medical examiner, testified that the decedent suffered a gunshot wound to the top of his forehead that was two inches below the top of his head, in the center of his forehead.  He also stated that there was no evidence of close-range firing on the skin around the entrance wound.  Dr. Osbourne testified that a deformed bullet was recovered from inside the brain itself and sent to ballistics.
>
> Officer Ian Nance testified that he received a radio call of a person screaming on July 22, 2007. The officer arrived at 54th and Arlington Street and found the decedent suffering from a gunshot wound to the forehead.  The officer also stated that, after arriving on the scene, he came into contact with someone claiming to be the decedent's brother who told him that someone started shooting at the

---

[1]  18 Pa.C.S.A. §§ 2502(c), 903(a)(1), 6106(a)(1), 6108, and 907(a), respectively.

[2] Appellants were tried in a joint trial before the Philadelphia County Court of Common Pleas.  The first five issues raised by both appellants are identical, while Steel raises an independent sentencing issue; and we address both appellants' issues in this memorandum.  Steel's brief incorporates by reference the argument section of Rudd's brief.  We call counsel's attention to Pa.R.A.P. 2137, and note that such practice is discouraged without previously notifying this court.

decedent and the decedent tried to pull out his weapon.

The decedent's mother, Karen Tunstall, testified she knew Michael Burton and that he grabbed her to prevent her from seeing the decedent's dead body out on Arlington Street right after the murder.

Michael Burton was called by the Commonwealth as an eyewitness at trial. Prior to trial, Mr. Burton gave a statement to homicide detectives that he was present when the decedent was shot and killed. He stated to detectives in summary that he saw "Seek" and "Mu", identified as nicknames for the defendants Sikwa Steel (Seek) and Michael Rudd (Mu), shoot at the decedent and flee the scene. He stated to detectives that he "saw Seek raise a gun and shoot [the decedent] one time in the head." He then stated that he "saw [the decedent] drop to the ground . . . and saw Mu point a gun in [the decedent's] direction and Mu fired his gun four or five times. After Mu fired his gun, both [Mu] and Seek ran toward the alley in the back of the Chinese store." Mr. Burton also identified both defendants as the shooters from a photo array. In his statement, he also told the detectives that he grabbed the decedent's mother to keep her from seeing the decedent's body on the street.

At trial, Mr. Burton stated that he was coerced into giving the answers in his statement. On cross-examination, he stated that he gave the statement to homicide detectives after being arrested for possessing drugs and a firearm. Mr. Burton stated that the homicide detectives coerced him by threatening to charge his mother with conspiracy on his drug charge and then he proceeded to make up the answers in his statement. He further stated that the homicide detectives are the ones who gave him the names of Sikwa Steel and Michael Rudd.

Detective John Cahill testified that he was the detective that interviewed Michael Burton and took his statement back in 2007. The detective further testified that Mr. Burton reviewed and signed the statement while also signing the identifications he made of the defendants on the photo arrays. Detective Cahill stated that he was not aware of any of the details surrounding Mr. Burton's arrest on a separate narcotics case.

. . . .

Officer Kevin Palmer testified to coming into contact with a person named Jimmy Montalmont on December 19, 2007. The officer stated that he placed Mr. Montalmont into police custody for possession of marijuana and submitted the marijuana for investigation rather than arresting him because Mr. Montalmont had indicated he had information. Officer Palmer testified that he took Mr. Montalmont to homicide and Mr. Montalmont volunteered information about the murder of the decedent in this case. Officer Palmer had no prior knowledge of this incident.

Jimmy Montalmont was called by the Commonwealth as an eyewitness at trial. Prior to trial, Mr. Montalmont gave two statements to homicide detectives indicating that he was present when the decedent was shot and killed. In 2007, he stated to detectives, "When I got to 54th and Arlington, I seen a boy named Seek (Sikwa Steel) come out of the Chinese store and fire two shots at [the decedent], then I seen a boy named Mu (Michael Rudd) come out of the pizza shop in the middle of the block and he shot at [the decedent] one time and [the decedent] went down. [The decedent] went down on the sidewalk across from the Chinese store." Mr. Montalmont also identified both defendants as the shooters from a photo array. He also stated to detectives that he saw Mu (Michael Rudd) fire a revolver and Seek (Sikwa Steel) fire a semi-automatic.

In 2012, Mr. Montalmont stated to detectives that Seek (Sikwa Steel) was the person who shot the decedent. He stated to detectives that Seek fired his gun once at the decedent up close and four times total. He further stated that Mu (Michael Rudd) was shooting at the decedent also but he did not know whether or not he actually hit the decedent because Mu (Michael Rudd) was not as close as Seek (Sikwa Steel) when he was firing.

At trial, Mr. Montalmont denied giving the answers in either of the statements and stated that he never spoke to homicide detectives about this case. In order to show Mr. Montalmont's state of mind during the time of the statement and why he denied making the contents of the statement at trial, the Commonwealth offered into evidence Mr. Montalmont's comment at the time the statement was given that "these guys will have me killed and I will be labeled a snitch." On cross-examination, the defense questioned Mr. Montalmont about him already being in custody on an open case at the time he gave the statement in 2007 and whether police told him he would receive a lesser sentence on a parole violation if he gave the statement in 2012. Mr. Montalmont denied talking to police and giving either of the statements but stated it was true that he was offered lesser of a sentence on the parole violation if he gave a statement in 2012.

Detective John Verrecchio testified that he was the assigned detective in this case. He stated that he had applied for an arrest warrant for the defendants in 2007 which was denied. He then indicated that he applied for an arrest warrant for the defendants after receiving the second interview of Jimmy Montalmont in 2012 and it was approved. The detective reviewed the affidavit of probable cause which stated Sikwa Steel shot at the decedent using a revolver and Michael Rudd shot at the decedent using an automatic. Detective Verrecchio testified that he may have mistakenly reversed the type of weapon fired by each defendant.

Sergeant Daniel Ayres testified that he responded to the crime scene on July 22, 2007 and searched the area for any weapons. Sergeant Ayres stated that he came into contact with the decedent's brother, Brian Tunstall, who said he watched the decedent get shot and that the decedent had a gun in his possession at the time. Detective Frank Mullen testified that he visited the hospital when the decedent was in critical condition. He stated that the decedent's brother denied any conversation with Sergeant Ayres about the shooting.

Kenneth Lay testified as an expert in firearms and ballistic evidence. Mr. Lay indicated he was given five fired cartridge cases and one bullet specimen. He stated that the five fired cartridge cases were caliber .380 automatic and the bullet specimen taken from the medical examiner's office was a caliber .38/9 millimeter. He testified that the bullet specimen recovered from the body of the decedent was most likely a .380 caliber automatic even though he could not prove that scientifically.

Special Agent Patrick Mangold testified that he conducted an interview with Jimmy Montalmont on December 18, 2007 in the homicide unit. Special Agent Mangold testified that he did not make any promises to Mr. Montalmont nor did he threaten him.

Detective Thomas Gaul was re-called to testify. He stated that he interviewed Jimmy Montalmont in 2012 and did not make any promises to him. Detective Gaul testified that he did not threaten Mr. Montalmont and that Mr. Montalmont was very forthcoming with the information he gave in the statement in 2012.

Trial court opinion, 11/13/14 at 2-6 (citations to record omitted).

Appellants were convicted of the aforementioned charges on January 21, 2014. On March 27, 2014, Rudd was sentenced to an aggregate

of 10-20 years' imprisonment, to be followed by 5 years' probation. Rudd filed a post-sentence motion on March 28, 2014. The trial court denied Rudd's post-sentence motion on June 18, 2014. On June 19, 2014, Rudd filed notice of appeal. The trial court ordered Rudd to produce a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b) on September 10, 2014. Rudd complied with the trial court's order, and the trial court has filed an opinion pursuant to Pa.R.A.P. 1925(a).

On October 17, 2014, the trial court sentenced Steel to an aggregate 15-30 years' imprisonment. Steel filed a timely notice of appeal on November 14, 2014. On December 15, 2014, the trial court ordered Steel to produce a concise statement of matters complained of on appeal pursuant to Rule 1925(b). Steel complied with the trial court's order, and the trial court issued an opinion pursuant to Rule 1925(a).

Appellants raise the following issues for our review:

I. Did the trial court err when it denied [Appellants'] motion for a judgment of acquittal, where [Appellants'] conviction was supported solely by the out-of-court statements of witnesses who recanted their accusations at trial, in violation of the due process guarantees provided by the Fourteenth Amendment to the United States Constitution and by Article I, Section 1 of the Pennsylvania Constitution?

II. Did the trial court err when it failed to supplement the standard jury instructions with the special instructions proposed by the defense, in a case where the only evidence against [Appellants] consisted of the out-of-

court statements of alleged eyewitnesses who recanted their prior accusations under oath at trial?

III. Did the trial court err when it denied [Appellants'] request to redact that portion of a Commonwealth witness' out-of-court statement, wherein the witness stated that, "if this [the witness cooperation] gets out, I will be killed," where no evidence suggested that anyone had ever attempted to intimidate the witness and where the admission of this portion of his statement unfairly suggested to the jury that the witness had recanted his accusation, at trial, due to intimidation?

IV. Did the trial court err when it overruled [Appellants'] objection to the Commonwealth's summation, where the prosecutor told the jury that a Commonwealth witness changed his story because he was afraid that it would "get out in state prison that he was a witness," where no evidence indicated that the witness harbored such fears and where the prosecutor's argument was not a fair response to anything argued by the defense?

V. Did the trial court err when it overruled [Appellants'] objection to the Commonwealth's improper vouching, when the prosecutor repeatedly told the jury that "the statements that they [the alleged eyewitnesses] gave to the homicide detectives are the truth"?

VI. Did [the] trial court abuse its discretion when it gave a appellate [sic] a much harsher sentence than his co-defendant without consistent and conclusive evidence as to who fired the shot that caused the death of the victim?[3]

Rudd's brief at 5-6; Steel's brief at 7 (Issue VI).

_____

[3] Issue VI is exclusive to appellant Steel.

**I.**

In the first issue raised for our review, appellants call into question our supreme court's decision in **Commonwealth v. Brown**, 52 A.3d 1139 (Pa. 2012).[4]  Appellants aver that **Brown** was wrongly decided "as a matter of federal constitutional law."  (Appellants' brief at 17.)[5]  Under the Pennsylvania constitution, the **Brown** decision, like any decision from the Pennsylvania Supreme Court, is binding on this court.  **Commonwealth v. Prout**, 814 A.2d 693, 695 n.2 (Pa.Super. 2002), citing Pa. Const. Art. V, § 1; **Commonwealth v. Chimenti**, 507 A.2d 79 (Pa. 1986).  Appellants concede that their argument is contrary to the **Brown** court's holding; however, we note that, pursuant to Pa.R.A.P. 302(a), appellants have adequately preserved the issue for potential reconsideration by our supreme court or federal review.  (**See** appellants' brief at 17-18.)

**II.**

In their second issue, appellants aver that the trial court erred when it refused to provide the jury with special instructions provided by the defense relating to out-of-court statements of witnesses, which were recanted during trial.  (**See** appellants' brief at 27.)

---

[4] In **Brown**, our supreme court held that a defendant's due process rights are not violated if out-of-court statements, which are later recanted at trial by the declarant, furnish legally sufficient evidence to sustain the defendant's conviction.  **Id.** at 1171.

[5] For the purposes of this memorandum, "appellants' brief" shall refer to Rudd's brief.

Our standard of review in assessing a trial court's jury instructions is as follows:

[W]hen evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

*Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa.Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014), quoting *Commonwealth v. Trippett*, 932 A.2d 188, 200 (Pa.Super. 2007) (citation omitted). Abuse of discretion is defined as "not merely an error of judgment; rather discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record[.]" *Antidormi*, 84 A.3d at 745, citing *Commonwealth v. Boxley*, 948 A.2d 742, 746 (Pa. 2008), *cert. denied*, 555 U.S. 1003 (2008) (citation omitted).

We have typically "granted trial courts broad discretion in phrasing a jury charge. Our main concern is that the charge clearly, adequately, and accurately presents the law to the jury for its consideration."

*Commonwealth v. Collins*, 810 A.2d 698, 701 (Pa.Super. 2002) (citation omitted).

> The trial court is not required to accept the language of the point submitted by counsel but rather is free to select its own form of expression. The only issue is whether the area [covered by the point for charge] is adequately, accurately and clearly presented to the jury for consideration.

*Commonwealth v. Bryant*, 462 A.2d 785, 789 n.2 (Pa.Super. 1983), quoting *Commonwealth v. Boone*, 429 A.2d 689, 694 (Pa.Super. 1981) (citation omitted).

The trial court stated that it was "not required to supplement the standard jury instructions with the special instructions proposed by [appellants.] There is no requirement for a special supplemental instruction that the only evidence consisted of the out-of-court statements of eyewitnesses who recanted their prior statements at trial." (Trial court opinion, 11/13/14 at 7.) After a careful review of the trial court's instructions to the jury in their entirety, we find that the point of charge relating to determining credibility was covered adequately and accurately and was clearly presented to the jury pursuant to *Bryant*.

The trial court's jury instructions relating to credibility were as follows:

> You have heard evidence that Jimmy Montalmont and Michael Burton made statements to homicide detectives on an earlier occasion that were inconsistent with their present testimony in this courtroom. You may, under the law, if you choose, regard this evidence as proof of

the truth of anything that the witness said in the earlier statement.

The way that I say it to bring it down to everyday terms is they gave a statement that is outside the courtroom that the detectives testified to and the witnesses were cross-examined about. You could take that statement as substantive evidence, as if it were said in the courtroom just like what they said in the courtroom. So you have what they said on the stand and the statement and you have to decide but that is just as powerful evidence, the statement, as the testimony in the courtroom. You may also consider this evidence to help you judge the credibility and weight of the testimony given by the witness at this trial. When you judge the credibility and weight of testimony, you are deciding whether you believe the testimony and how important you think the testimony is.

You should examine closely and carefully and receive with caution the statement of Jimmy Montalmont that he gave to homicide detectives if you find that he believed he would receive a benefit on his open case or on his parole because he gave two statements. At one point he had an open case. At a second point, he was in state custody and he had a minimum and maximum sentence -- in exchange, if he believed, in his mind, that he would receive a benefit in exchange for his statement.

You should examine closely and carefully and receive with caution the statement of Michael Burton to homicide detectives if you find that he believed he would receive a benefit on his open cases in exchange for his statement.

Notes of testimony, 1/17/14 at 42-44.

Appellants have failed to establish an abuse of discretion in the trial court's refusal to provide a supplemental instruction relating to the

eyewitnesses' testimony. As the trial court noted, "it was up to the jury as fact-finder to weigh the credibility of the witness' statements and their testimony at trial. Therefore, it was not error for the trial court to refuse to give the proposed supplemental instruction to the jury." (Trial court opinion, 11/13/14 at 8.)

### III.

In appellants' third issue on appeal, they aver that the trial court erred when it denied appellants' request to redact a portion of Montalmont's statement that was read in court, in which Montalmont stated that "if his cooperation 'gets out, [he] will be killed.'" (Appellants' brief at 37.) The trial court cited our supreme court's decision in **Commonwealth v. Ragan**, 645 A.2d 811, 818 (Pa. 1994), which stated that a witness' state of mind when making a statement that is later recanted to the police is relevant. We agree with the trial court's analysis that the instant appeal is similar to **Ragan**, and we accordingly affirm based on the trial court's opinion for this issue. (**See** trial court opinion, 11/13/14 at 9.)

### IV.

In the fourth issue for our review, appellants aver that the trial court erred when it overruled appellants' objection to the Commonwealth's repeating to the jury that Montalmont was "afraid that it would 'get out in state prison that he was a witness.'" (Appellants' brief at 39, citing notes of

testimony 1/16/14 at 201-202.) When reviewing a claim for prosecutorial misconduct, we use the following standard of review:

> Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one. Not every inappropriate remark by a prosecutor constitutes reversible error. A prosecutor's statements to a jury do not occur in a vacuum, and we must view them in context. Even if the prosecutor's arguments are improper, they generally will not form the basis for a new trial unless the comments unavoidably prejudiced the jury and prevented a true verdict.

***Commonwealth v. Bedford***, 50 A.3d 707, 715-716 (Pa.Super. 2012) (***en banc***); ***appeal denied***, 57 A.3d 65 (Pa. 2012) (citations omitted). ***See also Commonwealth v. Robinson***, 877 A.2d 433, 441 (Pa. 2005) (prosecutorial misconduct does not occur unless the jurors form a fixed bias and hostility toward the defendant based on the prosecutor's comments). When specifically considering a prosecutor's comments to a jury during closing arguments, this court has stated, "It is well settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence." ***Commonwealth v. Caldwell***, 117 A.3d 763, 774 (Pa.Super. 2015) (***en banc***) (citations omitted).

Appellants objected to the following from the Commonwealth's summation:

[Mr. Montalmont] wanted nothing to do with this. He denied everything. He denied being arrested for marijuana. Everything about him was a denial. Everything about him was to distance himself from the identifications that he made of these two people. Why? Because he has to go back to state prison for a long time and if it gets out in state prison that he was a witness--

. . . .

He has to worry about his own life for the next 6 to 16 years. He has to worry about his own protection and if it gets out in state prison that he was a witness in a homicide, that he was a Commonwealth witness in a homicide, that he identified two people and said I saw them commit a homicide, he is going to have a lot of problems in his life.

Notes of testimony, 1/16/14 at 201-202. We agree with the trial court's analysis both during trial and in its opinion that the assistant district attorney's comment was "in response to some things that were said by the defense." Specifically, Rudd's counsel indicated during his closing argument that Montalmont's own criminal issues might have motivated Montalmont's statement to the police. (**See** notes of testimony, 1/16/14 at 150-154.)

Moreover, as the Commonwealth noted, Montalmont voiced his concerns to the police about the safety and well-being of both himself and his family in light of his providing information to the police. Montalmont was concerned that if knowledge of his providing information to the police got out, he would be killed. (Notes of testimony, 1/15/14 at 168.) Montalmont also requested that he and his family be moved because Montalmont was afraid of being labeled as a "snitch" and killed. (**Id.** at 169.) Based on this

testimony, which was admitted by the trial court, the assistant district attorney's comments regarding Montalmont's fear for his and his family's safety were supported by the evidence. (**See id.** at 139.) Therefore, the prosecutor's comments during the Commonwealth's summation were not improper, and this issue has no merit.

**V.**

In their fifth and final shared issue on appeal, appellants aver that the trial court erred by overruling appellants' objection to improper vouching by the Commonwealth during closing arguments. Specifically, appellants allege that the Commonwealth assured the jury that statements from several of the Commonwealth's witnesses were truthful. (**See** appellants' brief at 41.)

It is well settled that vouching is a form of prosecutorial misconduct, occurring when a prosecutor "places the government's prestige behind a witness through personal assurances as to the witness's truthfulness, and when it suggests that information not before the jury supports the witness's testimony." **Commonwealth v. Reid**, 99 A.3d 427, 447 (Pa. 2014), citing **Commonwealth v. Williams**, 896 A.2d 523, 541 (Pa. 2006), **cert. denied**, 549 U.S. 1213 (2007).

In determining whether the Commonwealth improperly vouched for the credibility of two of its witnesses in this case, we find **Commonwealth v. Judy**, 978 A.2d 1015 (Pa.Super. 2009), to be instructive. In **Judy**, this court stated that,

> It is settled that it is improper for a prosecutor to express a personal belief as to the credibility of the defendant or other witnesses. However, the prosecutor may comment on the credibility of witnesses. Further, a prosecutor is allowed to respond to defense arguments with logical force and vigor. If defense counsel has attacked the credibility of witnesses in closing, the prosecutor may present argument addressing the witnesses' credibility.
>
> ***Commonwealth v. Chmiel***, 585 Pa. 547, 889 A.2d 501, 544 (2005) (internal citations and quotations omitted).
>
> Thus, proper examination of the comments of the assistant district attorney in closing requires review of the arguments advanced by the defense in defense summation.

***Judy***, 978 A.2d at 1020.

Here, appellants claim that the following statements by the Commonwealth during its closing statement to the jury were improper vouching:

> [T]hey are going to tell the truth because the last thing anyone wants to do when they are already in hot water is lie to a homicide detective. If you think you are in trouble now, what do you think is going to happen if a homicide detective finds out you are lying?
>
> (Notes of testimony, 1/16/14 at 204.)
>
> . . . .
>
> Who signs their name in the presence of the police that many times unless what

> they are saying is true, unless they are
> ready to stand by what they are saying
> at that time?

[(*Id.*)]

Appellants' brief at 41.

During the closing statement for the defense, counsel for both appellants called the Commonwealth's witnesses' credibility into question several times. At one point, Rudd's counsel said, "There is one fact that is 100 percent clear in this case; the District Attorney's supposed eyewitnesses are liars." (Notes of testimony, 1/16/14 at 140.) Steel's counsel, during his closing argument, referenced Mr. Burton's statement:

> You know that Mr. Burton then is not reinterviewed
> at any point in time in five years. Mr. Burton comes
> into court because he is subpoenaed. He tells the
> DA out in the hallway, that statement, I lied. It is
> bogus, in his words, and he gets on the stand and he
> has never testified under oath in this case before,
> and what does he tell you? It is all a bunch of lies.

*Id.* at 178-179.

These excerpts from the defense's closing arguments clearly indicate that the Commonwealth's witnesses' credibility has been called into question. Pursuant to *Judy*, the Commonwealth has the ability, during its closing statement, to make commentary regarding the credibility of its own witnesses, without improperly vouching. Taken within the context of his entire closing statement, the Commonwealth's attorney did not personally attest to the truthfulness of the witnesses' statements--but rather

- 18 -

commented on their credibility. Therefore, appellants' fifth issue is without merit.

## VI.

In his sixth and final issue, Steel avers that the trial court abused its discretion by sentencing him to a longer prison term than his co-defendant, Rudd.

> A challenge to the discretionary aspects of sentencing is not automatically reviewable as a matter of right. **Commonwealth v. Hunter**, 768 A.2d 1136 (Pa.Super. 2001)[,] appeal denied, 796 A.2d 979 (Pa. 2001). When challenging the discretionary aspects of a sentence, an appellant must invoke the appellate court's jurisdiction by including in his brief a separate concise statement demonstrating that there is a substantial question as to the appropriateness of the sentence under the Sentencing Code. **Commonwealth v. Mouzon**, 812 A.2d 617 (Pa. 2002); **Commonwealth v. Tuladziecki**, 522 A.2d 17 (Pa. 1987); 42 Pa.C.S.A. § 9781(b); Pa.R.A.P. 2119(f). "The requirement that an appellant separately set forth the reasons relied upon for allowance of appeal 'furthers the purpose evident in the Sentencing Code as a whole of limiting any challenges to the trial court's evaluation of the multitude of factors impinging on the sentencing decision to exceptional cases.'" **Commonwealth v. Williams**, 562 A.2d 1385, 1387 (Pa.Super. 1987) (**en banc**) (emphasis in original).

**Commonwealth v. McNear**, 852 A.2d 401, 407-408 (Pa.Super. 2004).

Steel failed to include a Rule 2119(f) statement in his brief. "A failure to include the Rule 2119(f) statement does not automatically waive an appellant's argument; however, we are precluded from reaching the merits of the claim when the Commonwealth lodges an objection to the omission of

- 19 -

the statement." ***Commonwealth v. Love***, 896 A.2d 1276, 1287 (Pa.Super.

2006), ***appeal denied***, 940 A.2d 363 (Pa. 2007), citing ***Commonwealth v.***

***Hudson***, 820 A.2d 720, 727 (Pa.Super. 2003), ***appeal denied***, 844 A.2d

551 (Pa. 2004).

In the instant case, the Commonwealth objected to Steel's lack of a

Rule 2119(f) statement:

> Rather, Steel was required to provide a statement
> demonstrating a substantial basis [for] appellate
> review. Pa.R.A.P. 2119(f). His failure to do so is a
> fatal defect that renders his claim non-cognizable.

Commonwealth's brief at 21 (citations omitted). Because the

Commonwealth has objected to Steel's failure to include a Rule 2119(f)

statement in his brief, we cannot consider the merits of appellant's claim, as

we are precluded from doing so.

Judgments of sentence as to both appellants are affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/23/2016

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA

CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA      :      CP-51-CR-0012443-2012

Vs.      :

MICHAEL RUDD      :

## FILED

**OPINION**

NOV 1 3 2014

DeFino-Nastasi, J.

Criminal Appeals Unit
First Judicial District of PA

### PROCEDURAL HISTORY

On January 21, 2014, Michael Rudd (hereafter referred to as the "Appellant"), was found guilty by a jury, presided over by the Honorable Rose Marie DeFino-Nastasi, of 3rd Degree Murder, Conspiracy to Commit 3rd Degree Murder, Violation of the Uniform Firearms Act Section 6106 (VUFA 6106), Violation of the Uniform Firearms Act Section 6108 (VUFA 6108), and Possession of an Instrument of Crime (PIC).

On March 27, 2014, Appellant was sentenced to ten (10) to twenty (20) years state confinement for the 3rd Degree Murder conviction, ten (10) to twenty (20) years state confinement, to run concurrently, for the Conspiracy to Commit 3rd Degree Murder conviction, and five (5) years reporting probation, to run consecutively, on the VUFA 6106 conviction. There was no further sentence for the count of VUFA 6108 and PIC.

On March 28, 2014, Appellant filed post-sentence motions that were denied after a hearing on June 18, 2014.

On June 19, 2014, Appellant filed the Instant Appeal.

On September 18, 2014, Appellant filed a 1925(b) Statement of Matters Complained of on Appeal.

A 1

## FACTS

In the early morning hours of July 22, 2007, Charles Tunstall (hereafter referred to as the "decedent"), suffered a fatal gunshot wound to the head on 54th and Arlington Street in Philadelphia. (Notes of Testimony, Volume 1, Jan. 14, 2014, Page 111). Upon investigation of the crime scene, five fired cartridge cases from a caliber .380 semi-automatic pistol were recovered. (N.T., Vol. 3, Jan. 16, 2014, 47-52).

Dr. Marlon Osbourne, assistant medical examiner, testified that the decedent suffered a gunshot wound to the top of his forehead that was two inches below the top of his head, in the center of his forehead. He also stated that there was no evidence of close-range firing on the skin around the entrance wound. Dr. Osbourne testified that a deformed bullet was recovered from inside the brain itself and sent to ballistics. (N.T., Vol. 1, Jan. 14, 2014, 92-107).

Officer Ian Nance testified that he received a radio call of a person screaming on July 22, 2007. The officer arrived at 54th and Arlington street and found the decedent suffering from a gunshot wound to the forehead. The officer also stated that, after arriving on the scene, he came into contact with someone claiming to be the decedent's brother who told him that someone started shooting at the decedent and the decedent tried to pull out his weapon. (N.T., Vol. 1, Jan. 14, 2014, 108-136).

The decedent's mother, Karen Tunstall, testified that she knew Michael Burton and that he grabbed her to prevent her from seeing the decedent's dead body out on Arlington Street right after the murder. (N.T., Vol. 1, Jan. 14, 2014, 89-91).

Michael Burton was called by the Commonwealth as an eyewitness at trial. Prior to trial, Mr. Burton gave a statement to homicide detectives that he was present when the decedent was shot and killed. He stated to detectives in summary that he saw "Seek" and "Mu", identified as nicknames for the defendants Sikwa Steel (Seek) and Michael Rudd (Mu), shoot at the decedent and flee the scene. He stated to detectives that he "saw Seek raise a gun and shoot [the decedent] one time in the head." He then

*A* 2

stated that he "saw [the decedent] drop to the ground…and saw Mu point a gun in [the decedent's] direction and Mu fired his gun four or five times. After Mu fired his gun, both [Mu] and Seek ran toward the alley in the back of the Chinese store." Mr. Burton also identified both defendants as the shooters from a photo array. In his statement, he also told the detectives that he grabbed the decedent's mother to keep her from seeing the decedent's body on the street. (N.T., Vol. 1, Jan. 14, 2014, 148-164).

At trial, Mr. Burton stated that he was coerced into giving the answers in his statement. On cross-examination, he stated that he gave the statement to homicide detectives after being arrested for possessing drugs and a firearm. Mr. Burton stated that the homicide detectives coerced him by threatening to charge his mother with conspiracy on his drug charge and then he proceeded to make up the answers in his statement. He further stated that the homicide detectives are the ones who gave him the names of Sikwa Steel and Michael Rudd. (N.T., Vol. 2, Jan. 15, 2014, 1-18).

Detective John Cahill testified that he was the detective that interviewed Michael Burton and took his statement back in 2007. The detective further testified that Mr. Burton reviewed and signed the statement while also signing the identifications he made of the defendants on the photo arrays. Detective Cahill stated that he was not aware of any of the details surrounding Mr. Burton's arrest on a separate narcotics case. (N.T., Vol. 2, Jan. 15, 2014, 31-54).

Officer Clyde Frasier testified that he arrived at the crime scene on 3:37 a.m. on July 22, 2007. Officer Frasier stated that he recovered five .380 automatic caliber fire cartridge cases from the location of the crime scene. (N.T., Vol. 2, Jan. 15, 2014, 55-87).

Officer Kevin Palmer testified to coming into contact with a person named Jimmy Montalmont on December 19, 2007. The officer stated that he placed Mr. Montalmont into police custody for possession of marijuana and submitted the marijuana for investigation rather than arresting him because Mr. Montalmont had indicated he had information. Officer Palmer testified that he took Mr. Montalmont

A 3

to homicide and Mr. Montalmont volunteered information about the murder of the decedent in this case. Officer Palmer had no prior knowledge of this incident. (N.T., Vol. 2, Jan. 15, 2014, 88-104).

Jimmy Montalmont was called by the Commonwealth as an eyewitness at trial. Prior to trial, Mr. Montalmont gave two statements to homicide detectives indicating that he was present when the decedent was shot and killed. In 2007, he stated to detectives, "When I got to 54th and Arlington, I seen a boy named Seek (Sikwa Steel) come out of the Chinese store and fire two shots at [the decedent], then I seen a boy named Mu (Michael Rudd) come out of the pizza shop in the middle of the block and he shot at [the decedent] one time and [the decedent] went down. [The decedent] went down on the sidewalk across from the Chinese store." Mr. Montalmont also identified both defendants as the shooters from a photo array. He also stated to detectives that he saw Mu (Michael Rudd) fire a revolver and Seek (Sikwa Steel) fire a semi-automatic. (N.T., Vol. 2, Jan. 15, 2014, 120-170).

In 2012, Mr. Montalmont stated to detectives that Seek (Sikwa Steel) was the person who shot the decedent. He stated to detectives that Seek fired his gun once at the decedent up close and four times total. He further stated that Mu (Michael Rudd) was shooting at the decedent also but he did not know whether or not he actually hit the decedent because Mu (Michael Rudd) was not as close as Seek (Sikwa Steel) when he was firing. (N.T., Vol. 2, Jan. 15, 2014, 186-190).

At trial, Mr. Montalmont denied giving the answers in either of the statements and stated that he never spoke to homicide detectives about this case. (N.T., Vol. 2, Jan. 15, 2014, 174-190). In order to show Mr. Montalmont's state of mind during the time of the statement and why he denied making the contents of the statement at trial, the Commonwealth offered into evidence Mr. Montalmont's comment at the time the statement was given that "these guys will have me killed and I will be labeled a snitch." (N.T., Vol. 2, Jan. 15, 2014, 120-170). On cross-examination, the defense questioned Mr. Montalmont about him already being in custody on an open case at the time he gave the statement in 2007 and whether police told him he would receive a lesser sentence on a parole violation if he gave the statement in 2012.

A 4

Mr. Montalmont denied talking to police and giving either of the statements but stated it was true that he was offered lesser of a sentence on the parole violation if he gave a statement in 2012. (N.T., Vol. 2, Jan. 15, 2014, 170-180).

Detective John Verrecchio testified that he was the assigned detective in this case. He stated that he had applied for an arrest warrant for the defendants in 2007 which was denied. He then indicated that he applied for an arrest warrant for the defendants after receiving the second interview of Jimmy Montalmont in 2012 and it was approved. The detective reviewed the affidavit of probable cause which stated Sikwa Steel shot at the decedent using a revolver and Michael Rudd shot at the decedent using an automatic. Detective Verrecchio testified that he may have mistakenly reversed the type of weapon fired by each defendant. (N.T., Vol. 2, Jan. 15, 2014, 194-214).

Sergeant Daniel Ayres testified that he responded to the crime scene on July 22, 2007 and searched the area for any weapons. Sergeant Ayres stated that he came into contact with the decedent's brother, Brian Tunstall, who said he watched the decedent get shot and that the decedent had a gun in his possession at the time. Detective Frank Mullen testified that he visited the hospital when the decedent was in critical condition. He stated that the decedent's brother denied any conversation with Sergeant Ayres about the shooting. (N.T., Vol. 2, Jan. 15, 2014, 216-232).

Kenneth Lay testified as an expert in firearms and ballistic evidence. Mr. Lay indicated he was given five fired cartridge cases and one bullet specimen. He stated that the five fired cartridge cases were caliber .380 automatic and the bullet specimen taken from the medical examiner's office was a caliber .38/9 millimeter. He testified that the bullet specimen recovered from the body of the decedent was most likely a .380 caliber automatic even though he could not prove that scientifically. (N.T., Vol. 3, Jan. 16, 2014, 36-58).

A 5

Special Agent Patrick Mangold testified that he conducted an interview with Jimmy Montamont on December 18, 2007 in the homicide unit. Special Agent Mangold testified that he did not make any promises to Mr. Montalmont nor did he threaten him.

Detective Thomas Gaul was re-called to testify. He stated that he interviewed Jimmy Montalmont in 2012 and did not make any promises to him. Detective Gaul testified that he did not threaten Mr. Montalmont and that Mr. Montalmont was very forthcoming with the information he gave in the statement in 2012. (N.T., Vol. 3, Jan. 16, 2014, 59-111).

## ANALYSIS

I. In his first claim, Appellant argues that the trial court erred when it failed to supplement the standard jury instructions with the special instruction proposed by the defense, in a case where the only evidence against Appellant consisted of the out-of-court statements of alleged eyewitnesses who recanted their prior accusations under oath at trial.

The proposed jury instruction is attached as Court Exhibit A.

The trial court did not err when it failed to supplement the standard jury instructions with the special instruction proposed by the defense because the trial judge has the discretion to accept or reject supplemental instructions proposed by counsel. Where the basic charge properly covers the requested point, it is not error for trial judge to refuse to give additional instructions. Pa. R. Crim. P 647, Com. v. Gardner, 371 A.2d 986 (1977). The trial court is not required to accept the language of point submitted by counsel, but rather is free to select its own form of expression in jury instructions, and the only issue is whether the area covered by the charge is adequately, accurately and clearly presented to the jury for consideration. Pa. R. Crim. P 647, Com. v. Bryant, 462 A.2d 785 (1983).

A 6

Witness' out-of-court statements, which were recanted at trial, furnished legally sufficient evidence to sustain Appellant's convictions for first degree murder and related charges, and thus the convictions did not violate due process; statements were reduced to writing, each witness signed every page of his statement and attestation statement declaring that information in statement was accurate, each witness was cross examined at trial, and statements were fundamentally consistent with one another such that statements were not patently unreliable. Com. v. Brown, 617 Pa. 107, 52 A.3d 1139 (2012).

Here, the trial court was not required to supplement the standard jury instructions with the special instructions proposed by the defense. There is no requirement for a special supplemental instruction that the only evidence consisted of the out-of-court statements of eyewitnesses who recanted their prior statements at trial. Although Mr. Montalmont's two statements differ regarding which defendant's bullet was the one that killed the decedent, they are fundamentally consistent with each other, and with Mr. Burton's statement, in that they all include the fact that they saw both defendants shooting at the decedent and that Sikwa Steel was closest to the decedent, standing approximately where the .380 caliber fired cartridge casings were located. Thus, the statements are not patently unreliable and the defense had the opportunity to fully cross-examine the witnesses at trial.

The credibility and weight of the evidence is for the jury to determine as the fact-finder and the jury was charged on that issue. The trial court gave the standard jury instruction on prior inconsistent statements and the jury was told they could consider the statements as substantive evidence. The trial court also gave an instruction to the jury that they should examine closely and carefully and receive with caution the statement of Jimmy Montalmont if they found that he believed he would receive a benefit on his open case in exchange for his statement. Also, the

A 7

jury was charged that they should examine closely and carefully and receive with caution the statement of Michael Burton if they found that he believed he would receive a benefit on his open cases in exchange for his statement. Thus, it was up to the jury as fact-finder to weigh the credibility of the witness' statements and their testimony at trial. Therefore, it was not error for the trial court to refuse to give the proposed supplemental instruction to the jury.

II. In his second claim, Appellant argues that the trial court erred when it denied Appellant's motion for a judgment of acquittal because his conviction violated the due process guarantees provided by the Fourteenth Amendment to the United States Constitution and by Article 1, § 8 of the Pennsylvania Constitution, where his conviction was supported solely by the out-of-court statements of witnesses who recanted their accusations at trial.

As noted in his 1925(b) Statement of Matters Complained on Appeal, Appellant acknowledges that, as a matter of state constitutional law, the Pennsylvania Supreme Court has decided that such evidence can be sufficient to convict. Com. v. Brown, 617 Pa. 107, 52 A.3d 1139 (2012). Appellant believes Brown to have been wrongly decided and raises this issue here to preserve it for future state and federal review. Thus, the trial court did not err when it denied Appellant's motion for a judgment of acquittal because the ruling was consistent with Pennsylvania law as stated supra.

III. In his third claim, Appellant argues that the trial court erred when it denied Appellant's request to redact that portion of the out-of-court statement of Commonwealth witness Montalmont, wherein he stated that, "if this [Montalmont's cooperation] gets out, I will be killed." Appellant argues that the trial court erred because there was no evidence which suggested that anyone had ever attempted to intimidate Montalmont and the admission of this portion of his statement unfairly suggested to the jury that Montalmont had recanted his accusation, at trial, due to intimidation.

A 8

The trial court did not err when it denied Appellant's request to redact part of the statement by the witness because the statement was relevant to show why the witness may have recanted his statement at trial. The determination of whether such statements are admissible is within the sound discretion of the trial court and will be reversed only upon an abuse of that discretion. Com. v. Ragan, 538 Pa. 2, 16, 645 A.2d 811, 818 (1994). In Ragan, the Supreme Court of Pennsylvania held that the fact that the witness was considering the idea of not testifying against the defendant would seem to discredit his subsequent testimony in which he renounced his identification of the defendant and was admissible to show the state of mind of the witness at the time of the discussion with the detective. Id. at 819.

Here, the trial court properly admitted the portion of the statement by the witness Montalmont to a homicide detective in which he stated that, "If this [Montalmont's cooperation] gets out, I will be killed." On the record, the trial court stated that the statement was admissible because, "That's his state of mind as to why he is going south...He is not saying that they did anything. It is just what he thinks will happen, that's all." (N.T., Vol. 2, Jan. 15, 2014, 137-138). This situation is similar to Ragan because the evidence is admissible to show the state of mind of the witness at the time of the discussion with the detective and is relevant to show a motive as to why the witness may have recanted his statement at trial. Thus, admitting the statement does not constitute an abuse of discretion by the trial court.

IV. In his fourth claim, Appellant argues that the trial court erred when it overruled defense counsel's objection to the Commonwealth's summation, where the prosecutor told the jury that witness Montalmont changed his story because he was afraid that it would "get out in state prison that he was a witness" when no evidence indicated that Montalmont harbored such fears and the prosecutor's argument was not a fair response to anything argued by the defense.

A9

The trial court did not err when it overruled defense counsel's objection to the Commonwealth's summation because a prosecutor has considerable latitude during closing arguments and the statement was an inference which could be reasonably derived from the evidence. With specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that in reviewing prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made. Com.v. Sampson, 900 A.2d 887, 890 (Pa.Super.2006). Our review of prosecutorial remarks and an allegation of prosecutorial misconduct requires an evaluation as to whether a defendant received a fair trial, not a perfect trial. Com. v. Judy, 978 A.2d 1015, 1019 (Pa.Super.2009). It is well settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence. Further, prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. Prosecutorial misconduct is evaluated under a harmless error standard. Id. at 1020.

Here, the prosecutor's comment that, "[The witness] distanced himself from the identifications that he made of these two people. Why? Because he has to go back to state prison for a long time and if it gets out in state prison that he was a witness in a homicide…he is going to have a lot of problems in his life". (N.T., Vol. 3, Jan. 16, 2014, 201-202). As stated on the record, the trial court overruled the defense's objection to this comment because "it is fair response to some things that were said by the defense." Id. at 201. Since the defense argued that the witnesses were lying in their statements for their own personal gain, the prosecutor was

allowed to respond to this argument by offering a reason supported by the evidence as to why the witness may have recanted his statement at trial. Here, the prosecutorial comments were a proper inference taken from evidence in the record, specifically Mr. Montalmont's statement that he was in fear of being labeled a snitch. Furthermore, it cannot be found that the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility towards the defendants, thus impending their ability to weigh the evidence objectively and render a true verdict. Thus, the trial court did not err when it overruled defense counsel's objection to this remark made during the prosecutor's closing argument.

V. In his fifth claim, Appellant argues that the trial court erred when it overruled defense counsel's objection to the Commonwealth's improper vouching, when the prosecutor repeatedly told the jury that "the statements that they [the alleged eyewitnesses] gave to the homicide detectives are the truth."

The trial court did not err when it overruled defense counsel's objection to the Commonwealth's statement in closing argument because the prosecutor is allowed to respond to defense arguments with logical force and vigor. Improper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record. Com. v. Cousar, 593 Pa. 204, 232, 928 A.2d 1025, 1041 (2007). However, the prosecutor may comment on the credibility of witnesses. Com. v. Jones, 571 Pa. 112, 811 A.2d 994, 1006 (2002); Com. v. Simmons, 541 Pa. 211, 662 A.2d 621, 639 (1995). Further, a prosecutor is allowed to respond to defense arguments with logical force and vigor. Com.. v. Chmiel, 585 Pa. 547, 620, 889 A.2d 501, 544 (2005). If defense counsel has attacked

the credibility of witnesses in closing, the prosecutor may present argument addressing the witnesses' credibility. Id.

Here, defense counsel stated in his closing argument that, "You have a witness stand in a court room and nobody, nobody walked in at any point in time and identifies either one of these two guys as being involved in this." (N.T., Vol. 3, Jan. 16, 2014, 174). Defense counsel continued, "[The statement] is bogus, in his words, and he gets on the stand and he has never testified under oath before and what does he tell you? It is all a bunch of lies." Id. at 178-179. The argument of defense counsel was that the statements given by the witnesses were not true. The prosecutor was allowed to respond in his closing argument that the witnesses' statements were true. Here, the prosecutor commented on the credibility of the witnesses in response to defense counsel's argument as to their incredibility with logical force and vigor. Thus, the trial court did not err when it overruled defense counsel's objection to the remarks made during the prosecutor's closing argument.

## CONCLUSION

Based on the foregoing, Appellant's motion should be denied and the rulings of the trial court should be affirmed.

By the Court:

_Rose Marie DeFino-Nastasi_
Rose Marie DeFino-Nastasi, J.

A 12